and Patricia M. Vandermyde as found by Thomas Clyde. Please start.  May it please the court, Mr. Ritchie. Good morning. I represent the defendants, the appellants David and Patricia Vandermyde. They are the landowners over which the lane which is marked. Looking at my appendix, page 21, which has a color-coded map showing the different routes taken by the plaintiff through the years and showing in yellow the route which is in dispute here, mostly the vertical section of the yellow which is not a granted easement. The horizontal section is a granted easement showing up in deeds, but we are interested in the vertical section between what's called the Hook Farm and the Neuendijk Vandermyde Farm. That is the lane which much of the testimony shows has been impassable or had been impassable for many years until it was improved and cleared. Now the burden of proof in this case, I mean the standard review in this case, is whether it's against the manifest way of the evidence. Correct. And in this case there was conflicting testimony, correct? That's correct. So the trial judge made a determination. Yes he did, your honor. The trial judge is... Thank you, this is... I noticed your voice is not what it normally is. Well, this is just the way I am. I understand. I appreciate your honors for accommodating my schedule also, but this isn't going to get any better. You know what, we're just so glad to see you and there's water in case you need it. Okay, thank you. This isn't going to get any better through time here today anyway. Yes, your honor, the trial judge made his findings. The trial judge, however, did not address certain issues. And the trial judge's findings do not support, do not mean as a matter of law that all the elements of adverse possession have been met. For instance, the trial judge's findings say that after 1968 a four-row combine was used. Well, that's great, but it doesn't give us a starting date of when a four-row combine was used. And the confluence or the convergence of all the elements must be met at the same time in order to start the clock ticking on adverse possession or adverse use of an easement. And it's striking because the court could not point to any testimony and say a four-row combine was used starting April 6th of whatever date. He said sometime after 1968 a combine was used. And the court also found that every year Mr. Mills or his people used some form of equipment. Well, there's testimony that the kids would go check his livestock with a motorcycle. The court did not say a combine was used every year. Therefore, you get a 20-row easement for a 20-foot combine. In short, the court's findings do not support the granting of an easement. So yes, the court did make findings. And as a matter of fact, Your Honor, I asked the court in my motion to reconsider filed on the 4th of December 2009, I said, Your Honor, you didn't address abandonment or expansion of the easement, and I wish you would because this is probably going up, and the court declined to do that. It did not address abandonment or expansion of the easement. And the reason I think, of course, that he didn't do that is because if he tried to write an opinion, it wouldn't write because it's not supported by the record. If he has to say something like sometime after 1968 a combine was used, he's certainly not going to be equipped by what's in the record to address expansion of the easement from motorcycles to go check livestock to a 20-foot easement because it's just not there. The other issue, which as long as we're there, the other issue I asked for clarification or guidance on was abandonment. The evidence shows clearly that the lane was grown up in trees and weeds, and the plaintiff used other routes like end rows on adjoining fields to get back, and the end rows, of course, were the first ones picked so that the combine could make the turn and go on the crossing rows. And independent witnesses said that, that he would use the end rows. And why would he do that? Well, because the lane wasn't passable. Now, the defendants buy the Neuendeck farm, and then in the early 90s, hire Dunn to clear the lane. And then that, if you look at the law, and there's a section of it in my brief, it says that the owner of the easement, the user of the easement, and this is on page 16, is not only the right, but the duty of the dominant owner to keep the easement in repair. The dominant owner, of course, being the one who has the easement. Now, to me, it's not fair for some guy to say, okay, I use this route, I use that route, and then after you maintain my easement, which I should have been doing all the time at your expense, then I'll claim that by adverse possession. That's just not fair, and the trial judge did not address that. I think the testimony of Alan Schaefer is important here, because Alan Schaefer said he was the main witness, the main independent witness to say, yes, when my father and I owned the farm, the Neuendeck farm, Mr. Mills would call every year, dutifully, to see if he could use the end rows and see when we were picking the end rows so he could get back to his field. Now, that testimony gives some indication of when that backfield got row cropped for the first time, but the trial court didn't think it was important that Mr. Mills use the end rows, so he really didn't, he didn't say he did or didn't use the end rows. The trial court rather lumped it all together and said, well, he used the lane for something every year. I think Alan Schaefer's testimony is to be believed, then, that yes, he did use the end rows, which means that after years of using alternate and different routes, when the lane is finally cleared, Mr. Mills showed up and said, thank you for clearing my lane, now please get out of my way, I'm claiming this by adverse possession. I just don't think that's right. I don't think that's fair. Okay. Back in your honor. May I please score, Mr. Potter? Well, a little while back I had kind of a Seinfeld moment. I recognize that I had three prescriptive easement cases in my office, and I had this nagging question. Where are these coming from? Why are there still so many of them? Shouldn't they all have been eliminated by now? Shouldn't we have worked through them? So many of them seem to start in antiquity. But in any case, here we are. But simply put, this case is about the facts, and it's about the evidence that the trial judge heard. If there's a novel question of law here or public policy, I missed it. I think this is just about the facts. But they're not without interest, and if I may, I'd like to touch on some of the high points that I think the Court considered. Kenneth Mills lives at 115701 Crosby Road, Morrison. That is, Illinois Route 78. He's 70 years old. He's lived there virtually all of his life. His farm runs east and west from Crosby Road to the west, and about a mile to the west lies this 40-acre parcel accessed by the easement. North and east and adjacent to the 40 lies the Vandermyte parcel, Mr. Potter's clients, through which the easement runs. The Mills 40 is separated from the rest of the Mills farm by Rock Creek. Now, Mills' parents acquired the 40 in 1942, and the Court heard evidence about how Mills' father accessed the 40 and how he began to access it through this lane after the township took out a bridge that he'd previously been able to use and go through its woods. But the real story begins in 1968 when Ken Mills took over the family farming operation, because we have conceded that the intensity of the use probably—we didn't really hear much evidence, but we conceded in the previous—the intensity of the use probably increased at that point. And it's important to recognize at that time what the situation was in 1968. Mr. Potter, in his brief, suggested that the 40 acres was not tillable at that point, but Mr. Mills' testimony was that as early as the 1950s, it was partially tillable, 10, 12 acres or so, partially pastured, partially timbered. So he had reason to be back there with a variety of implements. The easement was part of a farm owned by a gentleman named Elwyn Neuendijk, and if you look at these cases, sometimes you'll see a parade of octogenarians, people historically who've traversed these easements and things like that who are a long, long time ago. Well, there are no Neuendijks, there's no one testified in behalf of them in this case, and the entire prescriptive period ran while the Neuendijks owned this farm. Mr. Vandermeijen only acquired this farm well after the 20-year period had run. But the really important thing about 1968, when Mr. Mills started farming, is what was the condition of the easement lane at that point. It's not as it appears, was not as it appears in the exhibits there, and you'll see it. Does a prescriptive easement exist before a court recognizes it? Well, that's a good question, Justice Wright. I believe it does. I believe it exists if all the conditions have been met. Okay, because your argument is from 1968 to 1988, the prescriptive easement was created, existed, but the lawsuit was not filed until? 2010, right. We were not, my client was not put on notice of Mr. Vandermeijen's objection to use of the easement lane until 1998. But they had a discussion when the land was purchased in 1992 that there could be use with permission. Only that discussion was of the Enbro, Your Honor. Okay. So you don't have a position whether the prescriptive easement exists before a court recognizes it? My position is that it does, that it had ripened in 1988. And then it's just a question of judicial determination whether. Would you address the abandonment issue that in 1998 permission was withdrawn? And what happened after that? Well, that was a holdup. Basically what Mr. Vandermeijen said at that point. After the holdup, what did your client do? Rented the property to Mr. Vandermeijen on Mr. Vandermeijen's terms, $100 an acre. And he had permission then to use the easement? My client was not using the easement at that point because Mr. Vandermeijen was farming the 40 acres. My client wasn't even, wasn't involved at that point. Vandermeijen was his tenant. So would you speak to abandonment? Do you think it's not abandonment because? No. No, I don't see any sense of abandonment. My client testified that he felt that they could work out the issue of closure of the easement and rental of the property. But the case law says that once the easement is established, once the 20 years is run, then it takes intent to abandon it. And there's no intent on my client's part, no evidence of intent to abandon the easement. What would be a statute of limitations in this case? I don't know of any, Your Honor. I saw a case that said something about 75 years or a general real estate statute of limitations, and I saw that in passing. I guess that's the only thing. Have you provided that to us? I have not. May I proceed? Yes, thank you. What's important about the lane in 1968 is it was not the open lane that you see in the photographs in the exhibits. It was a fenced farm line. It was fenced on both sides. It's 1,980 feet, 60 rods along the Vandermeijen parcel. It was entirely fenced on one side, and it was fenced for about 1,000 feet or half of it on the other side. And the only testimony as to the width of that lane at that point was Mr. Mills, that it was 20 to 24 feet in width. And the only evidence that we could find in the record was that somewhere in the early 80s, the half side, which would be, I guess, I'm having trouble thinking which side, but anyway, the half side, which would have been on the Neuendijk farm, not the boundary line with the Hook farm, was removed probably 15 years into Mr. Mills' use of the lane. And I think it's important to realize that, that this isn't just some path out there. This was a fenced farm lane similar to the one that comes in on the north side of the property. Bill's testimony about his use of the easement was unequivocal and unconditional. He said he used the lane for the combine, that he could always traverse the lane with the head, and that was maybe 14 to 15 feet. He used it for tractors, planter, tilling tools, pickup truck, and he used it each of the years from 1968 through 1995 when he quit farming and then was followed with a three-year tenancy by Ronald Merck. He never asked anyone's permission. His ag supplier also used the lane, and no one ever tried to restrict his use of the lane. And the location of the lane never changed, because that's sort of a red herring in this case. You hear anecdotal stuff that, well, somebody did this or somebody went in here, but this lane never moved. It wasn't like he was traversing an entire 80 and going in here one time or another. The lane was always in the same place. After Mills was done, Murr used the lane for his combine planter, tilling tools, and his co-op also used it, and his access was never restricted, and that was for a further period of three years. So that takes us from 1968 to 1988. Murr's testimony was also unequivocal and unconditional. Now, in 1981, Dave Vandermyde and his wife started renting the hook farm. That's 13 years into the Mills' use of the fenced lane. Vandermyde indicated he had very little knowledge of Mills' practices prior to 1981, but he acquired no interest in the farm over which the easement parcel runs until 1992. He wasn't a tenant. He was just a tenant on the farm next door. So Vandermyde's first legal interest in this property was in 1992, 24 years after Mr. Mills started running up and down the lane. And he first raised the issue then in 1998, as we've discussed, 30 years after the use began. And it's very interesting to compare the testimony of Mills, Murr, to that of Vandermyde and Alan Shaver, the new and dyke tenant during that time. Mills and Murr say, I did it. I used this. I ran up and down it. I did this. I used these implements. No one ever interfered with me. If they weren't interfered with, is it adverse? Oh, certainly. Had they been interfered with, had someone tried to stop them, then you would have the interposition of a landowner, and that could arguably stop the use. Or make it adverse. No, I don't think so. Because he was using the lane with permission. No, he never used it with permission. All he said was, I never asked permission, and no one ever interfered with my use. That's just a classic open use. Thank you for claiming that. Vandermyde and Shaver don't say he didn't. They say, I don't think he could have. I think it was too overgrown. I don't think he could have got a combine over it. And the interesting thing is, neither of them had any reason to use the lane, because Shaver had access to the entire new and dyke farm, of which he was a tenant. He could drive over it anywhere. He didn't need to get down to that 40 acres. Vandermyde didn't need to get down there. He could drive over the entire hook farm, on which he was a tenant, on the other side of the boundary fence. So they didn't need to use this lane. They just speculated. The only person that needed to use it was Mills and his subsequent tenant. And they just speculated that he couldn't use it. They said, oh, it's pretty messy, and we eventually cleaned it up in 1994. So the court heard this anecdotal testimony of Mr. and Mrs. Vandermyde about Mills and Muir using other routes. And those are the colored routes in Mr. Potter's exhibit. Mills flatly denies doing so. Muir didn't recall, except for taking his combine out across the hook field one time. But he says, it's possible someone working with me or for me could have done that. Each of these routes, oddly enough, would require Mills to pass over the hook property, at least by Vandermyde. It doesn't make any sense. And the court's commentary on this was, well, I heard that testimony, but be that as it may, the easement's established. And the court's absolutely correct. The issue's not what Mills might have done elsewhere. The issue's what he did on this route, straight up and down, a route that never changed for close to 30 years. Mills built a bridge. Mills did. He built a bridge in the late 70s, early 80s. If he was using the lane, why did he have to build a bridge? Because there were certain things that, to get to this property and use the lane, you've got to go out of your way. You've got to drive a few miles and come in. When he put the, it's an 8-foot bridge, Your Honor, and when he put it in, he could get a green card over it. He could go back, and Mr. Mills' testimony was, he had livestock in the timber across the creek, and before you get to the 40, there's probably 20 acres of timber, I'm speculating. Did he use the bridge to get to the livestock? He used it to check the livestock. He used it to take, you know, your usual four-wheeler, inspection vehicle, whatever. The bridge? The bridge, yes. Used the bridge to check the livestock. But he also used it to take grain out of this 40. But he could never, even when he put it in, it was already too small for a dual-wheel tractor, and it was too small for his combine. So it could never be as exclusive routing. So when did he start using the lane for his dual-wheel tractor and combine? His testimony was that he used that lane all of the years for various implements. Now that the... From 68? From 68. And the issue of the combine, my point is, there's a 20- to 24-foot fence lane, and it's available to him, all of it. And the fact that whether he drives on it with a pickup truck or whether he drives on it with a combine or whether he drives on it with a dual-wheel tractor, it's there at the beginning of his use of this easement, and it remains there for the better part of 15 years before either fence comes out. So I think that, you know, the combine issue is kind of a red herring here. I mean, I believe what Mr. Potter is saying, not to characterize his argument, but he's saying since you can't establish exactly when you started with the combine, you can't establish the beginning of the easement being that wide. Well, we know the easement was the only evidence is it's 20- to 24-feet wide. Counselor, you have two minutes. Thank you. So the trial court sat next to the witnesses, heard their testimony, gauged their credibility and recollection, assigned the appropriate weight. That's what trial judges do. In this case, we submit that the evidence overwhelmingly supports the trial court's judgment. Thank you, Professor. Thank you. Your Honors, it's interesting. Why would David Vanittermine and Ken Mills have a discussion about Ken's using the end rows shortly after David bought the farm if the lane were passable? I don't know. Mr. Ritchie admits the conversation took place. And there's only one reason that I can think of, and that is Mr. Mills wanted to use the end rows for his combine because the lane was not passable until it was cleared by Mr. Seester from Fenton in about 1994 at Mr. Vanittermine's expense. And what we have here is a guy who used several different routes, waited until the lane was cleared at someone else's expense, picked the lane to claim adverse possession, and said, please get out of my way. I own the right of passage over by adverse possession. And, again, I don't think that's fair. Thank you. Thank you. Thank you, Counsel. The court will take this case under advisement and rule with dispatch. We'll now take a brief recess for panel change.